Ian R. CAMERON, Plaintiff,

v.

SAINT FRANCIS HOSPITAL AND MEDICAL CENTER, Defendant.

No. 3:98CV2380 (GLG).

United States District Court, D. Connecticut.

July 9, 1999.

Andrew S. Golden, Robinson & Cole, Hartford, CT, for plaintiff.

Alexandra D. Mease-White, Day, Berry & Howard, Hartford, CT, for defendant.

### MEMORANDUM DECISION

GOETTEL, District Judge.

Plaintiff, Ian R. Cameron, has brought this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn.Gen.Stat. §§ 46a–51 *et seq.*, asserting that he was discriminated against and that his employment was terminated by his employer St. Francis Hospital and Medical Center, because of his age, race, and national origin. Plaintiff has also asserted state-law claims for negligent infliction of emotional distress and breach of an implied covenant of good faith and fair dealing. Pursuant to Rule 12(b)(6), Fed.R.Civ.P., defendant has moved to dismiss all counts of plaintiff's complaint except his ADEA claim.

A motion to dismiss filed pursuant to Rule 12(b)(6) tests only the sufficiency of the complaint and should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in sup-

port of his claim that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The issue is not whether the plaintiff will prevail but whether he is entitled to offer evidence in support of his claim. *Villager Pond, Inc. v. Darien,* 56 F.3d 375, 378 (2d Cir.1995), *cert. denied,* 519 U.S. 808, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). In ruling on a motion to dismiss, we accept as true all allegations of the complaint, and draw all reasonable inferences in favor of the plaintiff. *Still v. DeBuono,* 101 F.3d 888, 891 (2d Cir.1996). The following facts are taken directly from the plaintiff's complaint.

### Background

Dr. Cameron was born on July 22, 1933, and was 65 years of age at the time his complaint was filed. He is a white, non-Hispanic male of Scottish/European origin. He was hired by Mt. Sinai Hospital on or about September 30, 1980, as its Chief of Adult Psychiatry and was employed pursuant to a written contract of employment. In 1990, Mt. Sinai merged with St. Francis Hospital and Medical Center and the respective psychiatry departments were combined. On July 1, 1991, Dr. Cameron became Director of Psychiatry at St. Francis and Chief of Psychiatry at the Blue Ridge Center, a wholly-owned subsidiary of St. Francis that provides chemical dependency treatment. These new responsibilities were in addition to his position as Chief of Adult Psychiatry at Mt. Sinai. Plaintiff's full title was Chairman and Director of Psychiatry of Mt. Sinai and St. Francis. In 1992, the Center of Behavioral Health was created to reflect the unification of the mental health and chemical dependency programs of Mt. Sinai, St. Francis and Blue Ridge. Dr. Cameron was named Physician–in–Chief.

In all performance evaluations since 1980, Dr. Cameron received ratings of satisfactory or better. In December 1995 and 1996, he received significant bonuses for his work. However, on December 6, 1996, he was informed by letter from Ronald F. LaPensee, Senior Vice President of St. Francis and his immediate supervisor, that his employment as Chairman and Director of Psychiatry would be terminated effective May 31, 1997.

On February 17, 1997, Dr. Arturo Morales, who was Dr. Cameron's subordinate, told Dr. Cameron that he would be replacing him as Chairman and Director of Psychiatry. Dr. Morales is Hispanic and was 46 years of age at the time this statement was made to Dr. Cameron. Thereafter, Dr. Morales refused to take directions from Dr. Cameron and would only take directions from Dr. Ferrante, the new manager of the combined mental health network.

On June 5, 1997, Dr. Cameron filed an Affidavit of Illegal Discriminatory Practice with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission ("EEOC"). The Affidavit alleged age discrimination in violation of the ADEA and the CFEPA.

Dr. Cameron's employment was subsequently extended to September 30, 1997. Throughout this extension, Dr. Cameron claims that St. Francis treated him as if he had already been replaced by Dr. Morales. At the time of his termination, Dr. Cameron was 64 years of age.

The CCHRO held an investigatory fact-finding conference on June 22, 1998. During this investigation, Dr. Ferrante indicated that Dr. Morales' national origin was a factor in the decision to appoint him.[1]

---

1. At the CCHRO investigation, upon questioning by the CCHRO investigator, Dr. Ferrante stated:

 The person who was ... most open to making a move to relate to the community that we allegedly served, but had to served [sic]

well, that was Dr. Morales ... We serve a population that is forty percent Latino. We had only one person, literally, within the entire department, one person who spoke Spanish, who is bicultural, and that was Dr. Morales.... It was very clear that we need-

Thereafter, Dr. Cameron amended his CCHRO Affidavit on November 23, 1998 to assert claims of race and national origin discrimination. On December 7, 1998, this action was commenced in federal district court. On March 4, 1999, the CCHRO and EEOC issued a Release of Jurisdiction.

### Discussion

Defendant St. Francis Hospital and Medical Center asserts that Counts Two and Three of plaintiff's complaint, which allege federal and state claims of race and national origin discrimination, should be dismissed because the claims are untimely and plaintiff has failed to allege membership in a protected class. Defendant argues that Count Four should be dismissed for failure to state a claim of negligent infliction of emotional distress in that plaintiff has not and cannot allege that St. Francis acted unreasonably in the termination process or that any emotional distress allegedly caused by St. Francis has or might result in illness or bodily harm. Finally, defendant claims that Count Five should be dismissed for failure to state a claim for breach of an implied covenant of good faith and fair dealing because the unarticulated public policy relied upon by plaintiff is already addressed by a statutory remedy.

### I. Counts Two and Three—National Origin and Race Discrimination Claims Under Title VII and CFEPA

In Counts Two and Three, plaintiff alleges that he was terminated on the basis of his race and national origin, in violation of Title VII, 42 U.S.C. § 2000e, *et seq.*, and the CFEPA, C.G.S.A. § 46a–51. Defendant moves to dismiss these claims on two grounds: (1) that plaintiff failed to file timely charges of race and national origin discrimination with the EEOC and the CCHRO; and (2) that plaintiff has failed to allege membership in a protected class.

It is undisputed that plaintiff's original administrative complaint alleged only age

ed to do something in that area so that we

discrimination. Plaintiff did not amend this charge to include allegations of race and national origin discrimination until November 23, 1998, more than 300 days after his termination. In his amended charge and in his federal complaint, plaintiff alleges in addition to his age claim that he was discriminated against because he is a "white, non-Hispanic male of Scottish/European origin." Plaintiff argues that these claims were added based upon statements made during the CCHRO/EEOC investigation of his timely-filed age discrimination claim and, therefore, relate back to that claim. *See* Note 1, *supra.* Alternatively, he argues that "principles of fairness require that the statutory time periods for filing should be equitably tolled in light of the extraordinary circumstances of this case."

■ We quickly dispose of defendant's argument that plaintiff has not alleged that he is a member of a "protected class." The Supreme Court's decision in *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 278–79, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), established that Title VII "proscribe[s] racial discrimination ... against whites on the same terms as racial discrimination against nonwhites." *See also Cully v. Milliman & Robertson, Inc.,* 20 F.Supp.2d 636, 640 (S.D.N.Y.1998). In *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305 (2d Cir.1997), the Second Circuit held that the plaintiff, a white American male of Eastern European origin, had stated a claim for national origin discrimination under Title VII, when he alleged that he was not hired as Director of the Spanish Language Program at Columbia University whereas a male of Hispanic descent was hired. Plaintiff's claims in this case are not unlike those in *Stern.* Title VII prohibits the discharge of any individual because of such individual's race or national origin. As the Supreme Court held in *McDonald v. Santa Fe,* 427 U.S. at 278–79, 96 S.Ct. 2574, "[i]ts terms are not limited to discrimination against members of any

could more effectively serve.

particular race [or national origin]." Therefore, we reject defendant's argument that plaintiff is not a member of a protected class under Title VII.

We next consider whether plaintiff's national origin and race claims are time-barred. As a prerequisite to bringing a Title VII action in federal court, a plaintiff must file a charge of discrimination with the EEOC within 300 days of the alleged unlawful act. 42 U.S.C. § 2000e–5(e); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 392, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The purpose of the administrative filing requirement is to convey prompt notice to the employer, thereby encouraging conciliation whenever possible. *Drummer v. DCI Contracting Corp.*, 772 F.Supp. 821, 825 (S.D.N.Y.1991). The filing of an EEOC charge allows the EEOC to investigate, mediate, and take remedial action. *Porter v. Texaco, Inc.*, 985 F.Supp. 380, 383 (S.D.N.Y.1997). It also provides the employer with a chance to rectify voluntarily the alleged violation, thereby avoiding costly and time-consuming federal litigation. *See Id.*

The parties do not dispute that plaintiff timely filed his age discrimination charge with the CCHRO and the EEOC. They also do not dispute that the amended charge, adding claims of national origin and race discrimination, was filed outside the 300–day period. The issue that we must decide is whether this amended charge relates back to the original, timely-filed charge of age discrimination.

■ In the Second Circuit, the clear rule is that "[a] district court only has jurisdiction to hear Title VII claims that either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge." *Wilson v. Fairchild Republic Co.*, 143 F.3d 733, 739 (2d Cir.1998) (quoting *Butts v. City of New York Dept. of Housing Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir.1993)). The Second Circuit has recognized three kinds of situations where

claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action. The first type of "reasonably related" claim encompasses claims not raised in the charge where the conduct complained of would fall within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Butts*, 990 F.2d at 1402. The second type is a complaint alleging retaliation by an employer against an employee for filing an EEOC charge. *Id.* The third type is where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge. *Id.* at 1403; *see also Campbell v. A.C. Petersen Farms, Inc.*, 69 F.R.D. 457, 462 (D.Conn.1975). Only the first category has any applicability to the facts of this case.

Applying the test of whether the complaint falls within the "scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," a number of courts have allowed a plaintiff to allege types of discrimination other than those covered in the original charge of discrimination where the EEOC investigation actually covered the new type of discrimination alleged. *See, e.g., Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir.1970) (allowing amendment of sex discrimination complaint to include claims of racial discrimination relating to the same unlawful conduct); *Gausmann v. City of Ashland*, 926 F.Supp. 635 (N.D.Ohio 1996) (allowing plaintiff, an applicant for a firefighter position, to assert a gender discrimination claim although her EEOC charge alleged only age discrimination, where the EEOC investigation could reasonably have been expected to expand to determine whether the defendants discriminated against her on the basis of gender); *Latino v. Rainbo Bakers, Inc.*, 358 F.Supp. 870 (D.Colo.1973) (allowing amendment of complaint of national origin

discrimination to include sex discrimination).

In *Equal Employment Opportunity Commission v. American Machine & Foundry, Inc.*, No. 76–456, 1976 WL 617, at *4 (M.D.Pa. Aug.26, 1976), the court adopted the following test for determining whether the scope of a Title VII complaint exceeds the scope of the charge: whether the allegation of the complaint was stated in the charge itself or developed in the course of a reasonable investigation of that charge. The court noted that the EEOC charge should not be treated as a common-law pleading that

> strictly cabins the investigation that results therefrom, or the reasonable cause determination that may be rested on that investigation. The charge merely provides the EEOC with "a jurisdictional springboard to investigate whether the employer is engaged in any discriminatory practices;" and that investigation may well "disclose, as in this instance, illegal practices other than those listed in the charge." ... If during a reasonable investigation of a charge the EEOC uncovers evidence of other discrimination, not alleged in the charge, it is not obliged to close its eyes to that discrimination, or to initiate a new and separate charge with respect to it. It may include allegations of the newly discovered discrimination in the determination of reasonable cause and the complaint.... In other words, the proper test is not, as defendant suggests, to compare the scope of the complaint to the scope of the underlying charge. Rather, it is to compare the scope of the complaint to the scope of the investigation that reasonably flows out of the underlying charge.

*Id.* at 4–5 (internal citations omitted).

■ In the instant case, during the course of the actual administrative investigation of plaintiff's alleged discriminatory termination, one of defendant's witnesses indicated that plaintiff's national origin may have been a factor in the decision to terminate him. Because the CCHRO/EEOC investigation in fact revealed additional discrimination, defendant was on notice of this allegation and reasonably could have anticipated that the CCHRO/EEOC investigation would encompass this new claim of national origin discrimination. As the Second Circuit stated in *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 108 n. 10 (2d Cir.1978), "[t]he scope of the judicial complaint in a Title VII action has generally been construed to be limited not to the words of the charge but to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." If, as here, the EEOC in its investigation of an alleged unlawful practice turns up evidence of a type of discrimination other than alleged by the charging party, which the charging party includes in his amended charge and federal complaint, we find that this additional type of discrimination is "reasonably related" to plaintiff's original charge and, thus, relates back. Accordingly, we hold that plaintiff's claims of race and national origin discrimination are not time-barred and deny defendant's motion to dismiss Counts Two and Three of plaintiff's complaint.

## II. Count Four—Negligent Infliction of Emotional Distress

In Count Four, plaintiff alleges that St. Francis, by reason of the acts previously alleged, "was negligent in its willful, malicious and discriminatory treatment of Dr. Cameron, up to and including his termination of employment, which conduct was a direct and proximate cause of his emotional and mental injuries." (Pl.'s Compl. Ct. IV, ¶ 34). Plaintiff incorporates by reference the first 33 paragraphs of his complaint, in which he alleges, *inter alia,* that he endured "severe emotional and mental distress, including but not limited to extreme humiliation, anxiety and loss of self esteem," (Pl.'s Compl. ¶ 32), and that his pecuniary, emotional and mental injuries "were at all relevant times foreseeable

by a reasonable prudent person in the position of Saint Francis." (Pl.'s Compl. ¶ 33).

 It is well-settled that the mere termination of employment, even if wrongful, is not enough to sustain a claim for negligent infliction of emotional distress; such a claim must be accompanied by additional allegations of unreasonable conduct which occurred during the termination process or at the time of discharge. *Parsons v. United Technologies Corp.*, 243 Conn. 66, 88–89, 700 A.2d 655 (1997). A claim for negligent infliction of emotional distress focuses on the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable. *Young v. Bank of Boston Connecticut*, No. 3:93cv1642(AVC), 1995 WL 908616, at *7 (D.Conn. Mar. 31, 1995). Furthermore, plaintiff must allege that the defendant should have realized that its conduct involved an unreasonable risk of causing the distress, and from the facts known to it, should have realized that the distress, if it were caused, might result in illness or bodily harm. *Montinieri v. Southern New England Telephone Co.*, 175 Conn. 337, 341, 398 A.2d 1180 (1978).

 Defendant argues first that plaintiff has not alleged that defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that the distress, if it were caused, might result in illness or bodily harm. The Connecticut Supreme Court has made clear that "recovery for unintentionally caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." *Id.* at 345, 398 A.2d 1180. Plaintiff has alleged that he suffered severe emotional distress and mental injuries and that these injuries were at all times foreseeable to defendant. (Pl.'s Compl. ¶¶ 32–33). These allegations are sufficient to survive a motion to dismiss.

A more difficult question, however, is presented by defendant's argument that plaintiff has not alleged that defendant acted unreasonably in the termination process. (Although defendant makes this argument in the introductory paragraph of its Memorandum in Support of its Motion to Dismiss, defendant did not brief this issue nor file a reply to plaintiff's opposition).

In his complaint, plaintiff alleges that, although he was notified in December 1996 of his pending termination, he was not terminated until September 30, 1997. Thus, he argues that his termination spanned a ten-month period. He states that during this period, he was treated in a manner that was humiliating, embarrassing, and inconsiderate. He was essentially stripped of his authority and Dr. Morales was put in place as his *de facto* replacement. Thereafter, Dr. Morales, his subordinate, refused to take directions from him and stated that he would only take directions from Dr. Ferrante.

Whether plaintiff has sufficiently alleged unreasonable conduct on the part of St. Francis in the termination process is certainly debatable. This Court has previously noted that a distinction must be drawn between actions which are part of the termination process and actions which are merely related to the termination process. *See Sacco v. George Schmitt & Co.*, No. 3:97CV2180(AWT), 1998 WL 823039, at *5 (D.Conn. Sept. 14, 1998). In *Sacco*, the plaintiff argued that the termination process spanned a four-month period beginning with the defendant's insistence that plaintiff operate a press by himself, which led to plaintiff's injuring his back. Subsequently, the defendant threatened to terminate the plaintiff and then suspended him for three days without pay. When the plaintiff returned to work, the defendant warned him that his refusal to sign an accident analysis form constituted insubordination. After the plaintiff persisted in his refusal to sign the form for what he believed were legitimate reasons, the de-

fendant terminated his employment. This Court held that, although the facts alleged might support a claim for wrongful termination, the plaintiff had not alleged any facts supporting a claim that he was terminated in an inconsiderate, humiliating, or embarrassing manner. *See also Anastasio v. Knights of Columbus*, No. CV 970396806, 1998 WL 305498 (Conn.Super. May 22, 1998) (holding that, despite allegations that plaintiff was subjected to extreme verbal abuse by his supervisor during the course of his employment, plaintiff had not alleged unreasonable conduct during the termination process that would support a claim for negligent infliction of emotional distress).

In this case, plaintiff was told he was being terminated and complains of conduct that occurred during the ensuing ten months, which he characterizes as part of the termination process. In this respect, this case is distinguishable from *Sacco*. Plaintiff also cites to several state court decisions denying a motion to strike in circumstances where the alleged unreasonable conduct was not significantly different than in the instant case. *See Centi v. Lexington Health Care Center*, No. CV 960383535, 1997 WL 240943 (Conn.Super. May 1, 1997) (holding that the following allegations were sufficient to survive a motion to strike a claim for negligent infliction of emotional distress: that plaintiff's supervisor told other department heads, prior to informing plaintiff, that her performance was inadequate and that she would be terminated; that her supervisor told her that he would set unreasonable goals that she could never meet; and that her supervisor delivered the termination notice to her home on a Sunday); *Skierkowski v. Creative Graphics Services Inc.*, No. CV 94–0463242S, 1995 WL 283945, at *5 (Conn.Super. May 5, 1995) (holding that plaintiff stated a claim for negligent infliction of emotional distress where he alleged various representations that were made to him which led him to believe that he had job security and where he was terminated in front of two other employees and was told he was being terminated because the employer had problems with him).

In ruling on a motion to dismiss for failure to state a claim, the Court must accept as true all allegations of plaintiff's complaint and must draw all reasonable inferences in his favor. A complaint should be dismissed for failure to state a claim only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson, supra.* Although the Court has significant doubts as to whether the alleged conduct occurred during the termination process and whether it was sufficiently unreasonable to support a claim for negligent infliction of emotional distress, at this juncture, this Court finds that plaintiff has sufficiently alleged a claim for negligent infliction of emotional distress. Defendant's motion to dismiss Count Four is denied without prejudice to defendant's renewing this argument in a summary judgment motion after discovery has taken place.

### III. Count Five—Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff's last count is for breach of the implied covenant of good faith and fair dealing. Plaintiff alleges that "Saint Francis, by reasons of the [preceding alleged acts], up to and including his termination of employment in violation of the ADEA, Title VII, and the CFEPA, violated important public policies in its willful, malicious and unlawfully discriminatory treatment of Dr. Cameron." (Pl.'s Ct. V, ¶ 34). Defendant asserts that this Count should be dismissed because plaintiff has failed to identify an important public policy that has been violated and, to the extent that a specific public policy can be implied, plaintiff already has adequate statutory remedies.

Connecticut courts have recognized that "[e]very contract carries an implied covenant of good faith and fair

dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon,* 224 Conn. 231, 238, 618 A.2d 501 (1992). To establish a claim for breach of an implied covenant of good faith and fair dealing where the employment is terminable at will, plaintiff must establish that his dismissal was for a demonstrably improper reason, the impropriety of which is derived from a violation of some important public policy. *Johnson v. Chesebrough–Pond's USA Co.,* 918 F.Supp. 543, 550 n. 4 (D.Conn.), *aff'd,* 104 F.3d 355, 1996 WL 734043 (2d Cir.1996). Plaintiff has alleged that his termination was because of his age, race, and national origin, which, if true, would violate important public policies embodied in the ADEA, Title VII, and the CFEPA. However, as defendant correctly argues, because plaintiff already has an adequate means for vindicating these public policies, this Court will not recognize a separate claim for breach of a covenant of good faith and fair dealing. *See Bennett v. Beiersdorf, Inc.,* 889 F.Supp. 46, 49 (D.Conn.1995). As this Court held in *Bennett,* the public policy against age, [race or national origin] discrimination in employment cannot justify a claim based upon a breach of the covenant of good faith and fair dealing because there are already sufficient statutory remedies. *Id.* Therefore, we grant defendant's motion for summary judgment as to the Count Five of plaintiff's complaint.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss [**Doc. # 4**] is GRANTED as to Count Five only and DENIED as to Counts Two, Three, and Four.

**SO ORDERED.**